Filed 7/1/26  P. v. Manown CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN ANDREW MANOWN,<br>    Defendant and Appellant. | C103330<br><br>(Super. Ct. No. MAN-CR-FE-2021-0011935) |

Defendant Steven Andrew Manown pleaded no contest to contacting a minor with intent to commit a sexual offense (Pen. Code, § 288.3, subd. (a)).[1]  Before sentencing, Manown moved to withdraw his plea, claiming that his attorney rendered constitutionally ineffective assistance of counsel and that his plea was not knowing and voluntary due to counsel's deficient performance.  The trial court denied the motion and sentenced Manown consistent with the plea agreement.

On appeal, Manown contends that the trial court's denial of his motion was in error.  He argues that his counsel performed deficiently by failing to obtain a forensic examination of his cell phone to recover its exculpatory contents and by misadvising him of the consequences of his plea.  We affirm.

---

[1]  Undesignated statutory references are to the Penal Code.

1

The People charged Manown with attempted lewd or lascivious acts with a child under the age of 14 (§ 288, subd. (a); count 1), contact with a minor to commit a sexual offense (§ 288.3, subd. (a); count 2), and arranging a meeting with a minor to engage in lewd and lascivious behavior (§ 288.4, subd. (b); count 3). The parties stipulated that Manown arranged to meet a law enforcement decoy, whom he believed to be a 13-year-old girl, to engage in oral copulation and then arrived at the agreed-upon time and location. Manown pleaded no contest to contact with a minor for a sexual offense (§ 288.3, subd. (a)). The remaining counts were dismissed on the prosecutor's motion.

Before sentencing, Manown retained new counsel and moved to withdraw his plea pursuant to section 1018. The motion contended that Manown's prior attorney, Mary Ann Bird, rendered ineffective assistance of counsel in four respects: by failing to conduct a forensic examination of his cell phone to retrieve data critical to his defense; "coerc[ing] and manipulat[ing]" him into accepting the plea by telling him that he would be "shanked" in prison if he did not accept the offer with jail time; incorrectly advising him that he could petition to be relieved from lifetime sex offender registration; and erroneously informing him that, following his conviction, he could care for his minor child without restrictions. Manown asserted that he would not have accepted the plea deal absent these shortcomings.

The trial court held a hearing on Manown's motion at which multiple witnesses testified. Manown testified that he retained Bird after his arrest, met her in her office three or four times, and spoke with her on the phone about 10 times. While Manown was still in jail, Bird conveyed an initial plea offer of 120 days in jail.

Manown testified that he consistently maintained his innocence to Bird. Manown told Bird that, on the day of the alleged offense, he was texting with multiple escorts and became confused; he said he did not intend to meet with a minor. Manown believed that deleted messages on his cell phone would corroborate this account, and he asked Bird

between five and seven times if she had received his cell phone, which had been confiscated by law enforcement, or the information it contained. At various times, Bird informed Manown that she had not heard back, that she had not yet received the phone records, and that the district attorney would not let her see the phone so she would have to get a court order. Bird received screenshots from the law enforcement decoy's phone, but gained access to Manown's cell phone only shortly before the scheduled preliminary hearing.

Four or five days before that hearing, Bird and Manown met for 45 minutes to an hour. Bird informed Manown that the review of his cell phone yielded no other text messages. According to Manown, Bird explained the terms of the prosecution's new plea offer: that he could pick which of the three charges he would plead to, he would register as a sex offender, and he would receive two years of probation and no jail time. Depending on the charge to which he pleaded, Manown would be required to register as a sex offender for either 20 years or life.

Manown said that Bird discussed the risks of not taking the plea, including serving time in prison. Because of the nature of his offense, the risk of being "shanked" was higher in prison than in jail, and Manown might have to align with " 'skinheads' " for protection. Manown expressed his innocence, and Bird shrugged her shoulders and told him, " '[t]his is still a pretty good deal' " and " '[t]he [sex offender] list isn't a big deal, you don't need to worry about it.' " She also said that taking responsibility by accepting the plea deal would give him " 'bonus points' " in family court.

Manown further testified that, after his meeting with Bird, he called his mother and told her about the plea offer, including that it did not require jail time. He told her that Bird said he risked being "shanked" in prison and would have to associate with "skinheads" for protection.

3

Manown also testified that Bird texted him the night before the scheduled preliminary hearing to ask for his decision. He felt pressured because he had not yet made up his mind.

Thirty minutes before the preliminary hearing was scheduled to begin, he met with Bird outside the courtroom. Manown asked if he could ever be removed from the sex offender registry, and Bird said he could petition to remove his name. She also informed him that the plea had changed and now included 120 days in jail. She did not explain the reason for the change. Bird told Manown to make a decision that day, before the preliminary hearing, or else the offer would be withdrawn. Manown took the deal.

Manown additionally testified that, at some point, he and Bird had spoken about the potential impact the plea could have on his ability to be around his children. Bird told Manown he would be able to pick up and drop off his children at school, and doing so would "only become[] a problem when someone makes it a problem." She answered similarly about taking his children to parks. Bird said that if he took the deal, Manown would have to leave his house for six months to a year but would be able to return.

Manown testified that he was seeking to withdraw his plea because of the jail time and the plea's impact on visitation with his children. Manown explained that the important considerations in deciding to take the plea included the fear of prison, avoiding jail time so he could continue to work and participate in his home life, and being able to be around and care for his children.

Manown's mother testified at the hearing as well. She said that Manown called her after his in-person meeting with Bird before the scheduled preliminary hearing. His voice was shaking, and he told her he thought he had to take the plea offer but did not disclose its terms. He said Bird told him he would be "shanked" if he did not take the deal. Manown's mother attended most of Manown's court hearings and was present when he pleaded no contest, including during the conversation outside the courtroom

4

between Manown and Bird. Manown became quiet and pale after Bird informed him about the change in the prosecution's offer.

The prosecution called as witnesses defense investigator Brian Swanson and Bird. Swanson testified that Bird directed him to review Manown's cell phone for any text messages close to the date of Manown's arrest. Swanson inspected Manown's cell phone at the sheriff's department for 10 to 15 minutes but found no relevant messages. Swanson did not conduct a forensic extraction of the cell phone's data. He picked up Manown's cell phone records containing a list of phone numbers and delivered them to Bird's office.

Bird testified that she communicated to Manown the prosecution's offer of 120 days in jail for pleading to any one of the three charges. At no time did she tell him he would not face jail time. Bird shared possible alternatives to incarceration, including work programs, but informed him that sex offender registrants were typically rejected from such programs. Bird informed Manown that, if incarcerated, he needed to be aware that gangs might physically harm him. She denied telling him that "he would be shanked," clarifying she "would have said something along the lines of, this is a potential that this could happen. And you need to be aware for your own personal safety." She did not recall whether she told him to align with any specific groups in prison, but acknowledged doing so can be productive.

Bird further testified that Manown wanted to avoid registering because he was seeking custody of his children. Bird provided a mitigation packet to the prosecution in an effort to resolve the case without a registration requirement. Preparation of the mitigation packet included having Manown meet with a doctor and asking individuals to write character letters. After submitting the packet, Bird "begged and pleaded" with the prosecution for a settlement without sex offender registration based on Manown's lack of criminal history, his early acceptance of responsibility, and a risk analysis. Bird called, texted, and met with the prosecutor and "was on the verge of stalking her," but the

5

prosecutor declined. Bird advised Manown to stay abreast of potential future changes in the law, but told him that registration was currently for life for the section 288.3 and 288.4 charges. She advised him that registration would prevent him from participating in school activities and taking trips with his children; she said it would significantly affect his ability to parent.

Bird stated that Manown wanted her to investigate his phone to show that he had been texting multiple women at the same time and that his texting was focused on a person other than the decoy. Manown told Bird that he liked texting with older women and that when he was texting the decoy he thought he was communicating with a 30-year-old. He said "he was confused as to who, in fact, he was texting at the end." It took weeks, but Bird obtained a court order to review the phone. Swanson reviewed the phone and found that the text messages with women other than the decoy had been deleted. Bird testified that she thoroughly reviewed this potential defense prior to the scheduled preliminary hearing.

Bird further testified that, on the day of the plea, she reviewed the supplemental probation orders with Manown. The supplemental probation orders included sex offender registration provisions. As a standard practice prior to a plea, Bird reviews with her clients the offer, the consequences of any plea, the maximum and minimum exposure, any defenses, and their constitutional rights. Manown appeared to understand all of this. Bird informed him that the plea deal would expire after the preliminary hearing and that any subsequent offer would likely involve a prison term. After Bird discussed and re-reviewed everything with Manown, he decided to enter the plea the day of the scheduled preliminary hearing.

Bird denied ever threatening or lying to Manown to induce him to plead. She denied telling Manown he would get "bonus points" with the family court if he pleaded and did not know what that meant. Bird did more for Manown than she had for other clients, including securing a risk assessment from a doctor, preparing a mitigation packet,

6

and going to "extraordinary measures" to obtain data from the cell phone. Bird had "exhausted all avenues."

The trial court denied Manown's motion to withdraw his plea. Addressing each of the four contentions advanced in Manown's motion, the court first found that Bird had conducted an adequate investigation given the early stage of the case. The court read into the record the text exchange between Manown and the law enforcement decoy:

"[S]he says, 'Oh, are you okay with younger?' He says, 'What's younger?' 'Like not 18,' is the response. He responds, 'Okay.' IDK, 'I don't know about that.' [¶] She says, 'Okay. No problem.' Then, he responds again. 'You're not 18. You look 18.' And she says, 'Thanks. Not – I'm a little younger than that.' Various emojis. He says, 'No, okay.' He says, 'Sorry. Sounds kind of like a setup. I don't mean any offense. If it's not just too sketchy for me.' [¶] She says, 'Okay. I understand. Thanks.' Then he texts, again. 'No problem. I would like to meet you, though, if that's okay with you. Will you be 18 soon?' Suggesting that he was not confused about who he was texting at this time. She responds, 'I'll be almost 14 soon.' He says, 'Oh, damn.' She said, 'And then, how do you get your room? I have a girl I'm working with that helps me with that.' 'Oh, okay.' 'I could see her, maybe.' She says, 'She don't date anymore.' [¶] 'Oh, okay.' Then, she says – then, he says, 'She there with you?' And she says, 'You're asking a lot of questions for someone who doesn't want to book.' And then, he answers, 'My bad. Would you consider a car date?' "

Given this exchange, the trial court reasoned, there was no likelihood that the assertedly missing messages would have shown that Manown was confused about the age of the person with whom he was texting. He "consistently is told that this individual is younger than 18. And then, younger than 14. And he continues to … text message her. [¶] And there does not appear to be any confusion about which text thread he is using. It appears he is making reference to earlier messages in the text chain."

Second, the trial court rejected Manown's claim that Bird's reference to potential prison violence coerced him to accept the plea. She was not conveying a threat, and an attorney would be remiss not to explain to his or her client the potential consequences of a decision whether to plead, including extra-judicial consequences.

Third, the trial court found that Bird had discussed sex offender registration with Manown. It found her testimony credible and noted other references to registration in the plea materials and colloquy. The court also saw no shortcoming in counsel's reference to the possibility of future changes in the law involving sex offender registration. To the contrary, advising clients that the law could evolve was part of a lawyer's job.

Finally, the trial court found that Bird had extensive discussions about Manown's ability to continue caring for his children if required to register as a sex offender. Based on these findings, the court saw no evidence supporting Manown's motion to withdraw his plea.

The trial court then turned to sentencing. Consistent with the terms of the plea agreement, the court imposed and stayed a sentence of two years in prison, placed Manown on two years of formal probation, and imposed 120 days in jail. The court also ordered Manown to register as a sex offender under section 290.

Manown timely appealed. The trial court granted his request for a certificate of probable cause.

## DISCUSSION

### I.

Manown argues that the trial court erred in denying his motion to withdraw his plea because, he contends, the plea was the result of his counsel's ineffective assistance, specifically Bird's failure to obtain a forensic examination of his cell phone. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant " 'must satisfy a two-pronged showing: that counsel's performance was deficient, and that the

8

defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 736; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies … . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, at p. 697.) "To establish prejudice, the defendant has the burden of showing ' "that a reasonable probability exists that, but for counsel's incompetence, he [or she] would not have pled guilty." ' " (*People v. Codinha* (2021) 71 Cal.App.5th 1047, 1064.) A defendant's statement that he or she would not have accepted a plea must be corroborated by objective evidence. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 938.)

Assuming without deciding that Bird performed deficiently in not obtaining a forensic examination of Manown's cell phone, Manown has failed to show prejudice from that omission. Manown claims that "had counsel produced a proper extraction and corroborating records demonstrating concurrent texting, deletion of the 'decoy' messages after age disclosures, and message volume inconsistent with focused intent to communicate with underage females, there is at least a reasonable probability [he] would have rejected the plea bargain and elected to proceed to trial." The record, however, contains none of the missing digital evidence Manown claims would have made the difference in his decision. As a result, Manown's contention that he would not have entered the plea had counsel recovered his cell phone's exculpatory contents rests on nothing more than speculation. That is not sufficient to demonstrate error. (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147, quoting *People v. Williams* (1988) 44 Cal.3d 883, 937 [defendant must establish " 'prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel' "]; see also *In re Alvernaz*, *supra*, 2 Cal.4th at p. 938 [objective evidence required to corroborate claim by

defendant he would not have pleaded guilty].) Manown maintains that his own testimony about his text messaging substantiates his claim, but the question is not whether he himself believed there was helpful evidence in the phone but whether a forensic examination would have corroborated his belief and thus led him to decline the plea offer. On that score, the record is silent, and his claim of ineffective assistance therefore fails.

## II.

Manown next contends that Bird's deficient plea advice constituted ineffective assistance of counsel and established good cause to withdraw his plea under section 1018. Again, we disagree.

A trial court may permit a defendant to withdraw a guilty or no contest plea upon a showing of good cause. (§ 1018; *People v. Archer* (2014) 230 Cal.App.4th 693, 702.) " 'To establish good cause to withdraw a guilty plea, the defendant must show by clear and convincing evidence that he or she was operating under mistake, ignorance, or any other factor overcoming the exercise of his or her free judgment, including inadvertence, fraud, or duress.' " (*Archer*, at p. 702; see also *People v. Cruz* (1974) 12 Cal.3d 562, 566.)

"A trial court's decision whether to permit a defendant to withdraw a guilty plea under section 1018 is reviewed for abuse of discretion." (*People v. Patterson* (2017) 2 Cal.5th 885, 894.) A constitutional claim of ineffective assistance of counsel is subject to our independent review. (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 76.) "We accord deference to the trial court's factual determinations if supported by substantial evidence in the record, but exercise our independent judgment in deciding whether the facts demonstrate trial counsel's deficient performance and resulting prejudice to the defendant." (*Ibid.*) Moreover, the " 'standard for judging counsel's representation is a most deferential one.' [Citation.] We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance

10

because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' [Citation.] 'Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.' " (*In re Long* (2020) 10 Cal.5th 764, 773.)

Manown claims that Bird misadvised him in two respects: (1) she initially informed him that the plea offer would not include jail time but then said the opposite only moments before he had to make a decision whether to plead; and (2) she failed to accurately advise him about lifetime sex offender registration and its effect on his ability to parent. Bird testified on both of these topics, stating that she never conveyed a no-jail-time plea offer to Manown and that she advised him about the consequences of the registration requirement. The trial court found Bird's account credible, and the record— including Bird's testimony and other evidence of her efforts to obtain a resolution without a registration requirement—amply supports this finding.

Manown also claims that Bird "deployed fear-laden, coercive risk framing" to induce him to plead by telling him he would be "shanked" in prison and would need to align himself with "skinheads" for protection. After hearing testimony from Manown, his mother, and Bird, the trial court found that Bird's statements were not a threat and fell within the range of appropriate advice to a client who may be facing a prison term. Here too, the record contains adequate evidence to support this finding, including Bird's testimony about the nature and context of the cautionary advice she conveyed. We therefore conclude that Manown has not demonstrated that he received ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.

/s/
FEINBERG, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
WISEMAN, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12